## BUILDERS ASSOCIATION OF GREATER CHICAGO, Plaintiff,

### v.

## COUNTY OF COOK, a body politic and corporate, Defendant.

### No. 96 C 1121.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 2, 2000.

Timothy R. Conway, Edward B. Keidan, Conway & Mrowiec, Chicago, IL, for Plaintiff Builders Association of Greater Chicago.

Earl L. Neal, Jerome A. Siegan, Earl L. Neal & Associates, Chicago, IL, Donna M. Lach, Cook County State's Attorney, Chicago, IL, for Defendant County of Cook.

Michael K. Fridkin, Chicago Lawyer's Committee for Civil Rights Under Law, Inc., Chicago, IL, J. Randal Wexler, Sidley

& Austin, Chicago, IL, for Defendant Intervenors.

## MEMORANDUM OPINION

GRADY, District Judge.

This case presents a challenge to the constitutionality of a Cook County ordinance which requires that minority- and women-owned businesses be allotted certain percentages of the dollar value of each county construction contract. Plaintiff, Builders Association of Greater Chicago, is an association of general contractors and subcontractors engaged in the demolition, building and construction industry in and around Cook County. Defendants are the County of Cook itself and certain contractor associations representing minority- and women-owned enterprises. These associations—Association of Asian Construction Enterprises, Black Contractors United, Federation of Women Contractors, Hispanic–American Construction Industry Association, and Illinois Association of Minority Contractors—were permitted to intervene, over the objection of plaintiff.[1]

Plaintiff brings the action under 42 U.S.C. § 1983, claiming that the ordinance deprives its members of equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution. Defendants contend that the ordinance is an appropriate response to racial, ethnic and gender discrimination in the construction industry.

After extensive discovery, the parties filed cross-motions for summary judgment, the plaintiff contending that there was no evidence of discrimination that would support the ordinance and defendants countering that there was undisputed evidence

of discrimination. We concluded that a genuine factual issue was presented and denied both motions.[2]

A three-week bench trial was held, after which the parties submitted post-trial briefs. The case is now ready for decision.

## I.

### The Ordinance

The original set-aside ordinance was enacted in 1988.[3] The present version, Ordinance 93–0–38 (the "ordinance"), was enacted in 1993[4] and amended in 1994.[5] The ordinance requires that a minimum of 30 percent of the total value of any county construction contract be awarded to minority business enterprises (MBEs) and 10 percent to women-owned business enterprises (WBEs). To qualify as an MBE, at least 51 percent of the enterprise must be owned and controlled by one or more members of minority groups. To qualify as a WBE, at least 51 percent of the enterprise must be owned and controlled by one or more women. The M/WBE must, with certain exceptions, be located within the "Six County Region" of Cook, DuPage, Kane, Lake, McHenry or Will counties.

The ordinance refers to these percentages as "goals," but they are more than that. They are requirements for a successful bid, unless the conditions for a waiver are met.[6]

The ordinance contains the following definition of a "minority group" member:

A "minority group" member is an individual who is one of the following:

---

1. Memorandum Opinion of August 28, 1996.

2. Memorandum Opinion of January 5, 2000.

3. Cook County, Ill., Ordinance 88–0–29 (May 2, 1988).

4. Cook County, Ill., Ordinance 93–0–38 (Oct. 9, 1993).

5. Cook County, Ill., Ordinance 94–0–37 (Oct. 4, 1994).

6. The waiver process is explained infra at 20. In this opinion the terms "set-aside," "quota" and "preference" are used interchangeably to refer to the M/WBE requirements of the ordinance.

(i) African–American or Black (persons with origins in any of the Black racial groups of Africa);

(ii) Hispanic American (persons of Spanish culture with origins from Puerto Rico, Mexico, Cuba, South or Central America, Spain, Portugal, or the Caribbean Islands regardless of race);

(iii) Native American (American Indian); or

(iv) Asian–Pacific American (persons with origins from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territories of the Pacific, Northern Marianas, Laos, Cambodia, Taiwan, or the Indian subcontinent); or

(v) Any other ethnically or racially identifiable group found by the CCA [Contract Compliance Administrator] to have suffered actual racial or ethnic discrimination resulting in a competitive disadvantage or decreased opportunities to do business with the County of Cook.

The ordinance contains a number of other provisions and considerably more detail, but the foregoing summary will suffice for the present.

## II.

### *The Croson Case*

An understanding of the evidence received at trial will be enhanced if it is considered in light of the governing law. That law is provided by the decision of the United States Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Other cases will also be helpful to the analysis, but *Croson* is the primary reference, at least as to the set-asides for minority groups.[7]

The *Croson* case was concerned with an ordinance adopted by the City of Richmond, Virginia in 1983 which "required prime contractors to whom the city awarded construction contracts to subcontract at least 30 percent of the dollar amount of the contract to one or more Minority Business Enterprises (MBE's)." 488 U.S. at 477, 109 S.Ct. 706. The ordinance defined an MBE as "[a] business at least fifty-one (51) percent of which is owned and controlled... by minority group members," and minority group members were defined as citizens of the United States "who are Black, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id.* at 478, 109 S.Ct. 706. The plan provided for waivers "where a contractor can prove to the satisfaction of the [Director of the Department of General Services] that the requirements herein cannot be achieved." *Id.*

J.A. Croson Company submitted a bid on a city plumbing project that did not include a minority subcontract. Croson claimed that it had been unable to obtain a qualified minority subcontractor and sought a waiver. Although Croson was the only bidder, the waiver was denied. The city rebid the project and Croson brought suit under 42 U.S.C. § 1983, alleging an Equal Protection violation. The district court held for the city, the Fourth Circuit Court of Appeals reversed, and the Supreme Court ultimately affirmed the decision of the Court of Appeals.

The Supreme Court began its discussion by distinguishing the case of *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), where the Court had held constitutional a *federal* statute which conditioned eligibility for federal grants upon a showing that the applicant had complied with a minority set-aside requirement. Section 5 of the Fourteenth Amendment, providing that "the Congress

---

7. The ordinance in *Croson* involved only minority set-asides, not set-asides for women. The strict scrutiny test used in *Croson* is not applicable to the set-aside for women in this case, and the intermediate scrutiny test applicable to women will be discussed at a later point in this opinion, pp. 1092–93, infra. Much of *Croson's* discussion, however, is just as relevant to set-asides for women as it is to set-asides for minorities.

shall have power to enforce, by appropriate legislation, the provisions of this article," was found by the Court in *Fullilove* to be a constitutional grant of power to Congress to enact legislation addressing society-wide discrimination. *Croson* at 489–91, 109 S.Ct. 706. The Court went on to say, however,

> That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit constraint on state power, and the States must undertake any remedial efforts in accordance with that provision.

*Id.* at 490, 109 S.Ct. 706.[8] Section 1 of the amendment, of course, is the provision that includes the Equal Protection Clause: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." [9]

The *Croson* opinion explains the relationship of the Equal Protection Clause to legislation such as the Richmond ordinance. Although the Fourteenth Amendment was adopted in the aftermath of the Civil War, and the drafters were primarily concerned with the rights of the newly-freed slaves, it does not follow that blacks alone enjoy the constitutional right to equal protection of the laws. The Court stated:

The Richmond Plan denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race. To whatever racial group these citizens belong, their "personal rights" to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.

\* \* \* \* \* \*

We thus reaffirm the view expressed by the plurality in *Wygant [v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) ] that the standard of review under the Equal Protection Clause is not dependant on the race of those burdened or benefitted by a particular classification.

\* \* \* \* \* \*

[O]ur interpretation of § 1 stems from our agreement with the view expressed by Justice Powell in [*Regents of University of California v.] Bakke,* [438 U.S. 265, 289–290, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) ] that '[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.' [10]

*Id.* at 493–94, 109 S.Ct. 706.

*Croson* acknowledged that, while States and the subdivisions are barred by the Equal Protection Clause from adopting race-based remedies addressed to general

---

**8.** *Croson's* recognition of a distinction between the power of the federal and state governments to enact race-based remedies is no longer the law. In *Adarand Constructors v. Pena,* 515 U.S. 200, 228, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Court held that henceforth "[A]ll racial classifications, imposed by whatever federal, state or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests."

**9.** The full text of Section 1 reads: All persons born or naturalized in the United States and

subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1.

**10.** Justice Powell's final sentence in this passage was "If both are not accorded the same protection, then it is not equal." *Bakke,* 438 U.S. at 290, 98 S.Ct. 2733.

societal race discrimination, they *can*, consistently with the Clause, adopt race-based classifications to remedy their *own* discrimination. Referring to the plurality opinion in *Wygant*, 476 U.S. at 274, 106 S.Ct. 1842, the Court noted that for the school board involved in that case "to adopt a race-based layoff program affecting its own work force," there had to be " 'some showing of prior discrimination by the governmental unit involved.' " *Croson*, 488 U.S. at 492, 109 S.Ct. 706.

The Court explained how race discrimination by a private contractor could become so identified with the government itself that the government could adopt a race-based remedy for the problem. The theory is one of vicarious responsibility for the discriminatory acts of the contractor:

> As a matter of state law, the city of Richmond has legislative authority over its procurement policies, and can use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment.
>
> \*  \*  \*  \*  \*  \*
>
> Thus, if the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system.

*Croson* at 492, 109 S.Ct. 706. What is meant by "a system of racial exclusion practiced by elements of the local construction industry" that the city could "take affirmative steps to dismantle?" It is clear that it must be something more specific than discriminatory practices that exist in society as a whole or even in the construction industry. The Court held that the district court had erred in relying on the "the highly conclusionary statement of a proponent of the Plan that there was racial discrimination in the construction industry 'in this area, and the state, and around the nation.' " 488 U.S. at 500, 109 S.Ct. 706. The Court observed: "These

statements are of little probative value in establishing identified discrimination in the Richmond construction industry." *Id.* The Court repeated that:

> While the States and their subdivisions may take remedial action when they possess evidence that *their own* spending practices are exacerbating a pattern of *prior discrimination*, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief.

*Id.* at 504, 109 S.Ct. 706 (emphasis added).

The Court found that the numerical disparity between the contracts awarded to minority firms and the minority population of the City of Richmond would not provide support for the ordinance, because " '[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.' " *Id.* at 501, 109 S.Ct. 706 (quoting from *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). The Court pointed out that "the city does not even know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction contracts." *Id.* at 502, 109 S.Ct. 706.

The Court distinguished between the kinds of action a state or local entity could take "to rectify the effects of identified discrimination within its jurisdiction." *Id.* at 509, 109 S.Ct. 706. If the city of Richmond could show that nonminority contractors were "systematically excluding" qualified minority contractors from subcontracting opportunities,

> [T]he city could act to dismantle the closed business system by taking appropriate measures against *those who discriminate* on the basis of race or other illegitimate criteria. In the *extreme case*, some form of *narrowly tailored racial preference* might be necessary to

break down patterns of deliberate exclusion.

*Id.* at 509, 109 S.Ct. 706 (citations omitted) (emphasis added). The Court noted:

> The city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case. Under such circumstances, it is simply impossible to say that the city has demonstrated "a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842.

*Id.* at 510, 109 S.Ct. 706.

The Court concluded by affirming the decision of the Fourth Circuit that the Richmond ordinance violated the Equal Protection Clause:

> Because the city of Richmond has failed to identify the need for remedial action in the awarding of its public construction contracts, its treatment of its citizens on a racial basis violates the dictates of the Equal Protection Clause. Accordingly, the judgment of the Court of Appeals for the Fourth Circuit is Affirmed.

*Id.* at 511, 109 S.Ct. 706.

### III.

### *The Essential Points of Croson*

To summarize the *Croson* decision, what a governmental entity must show in order to justify a plan of minority set-asides is the following:

1. That qualified members of a minority group are being denied the opportunity to participate in contract opportunities offered by the governmental entity because of their race or ethnicity;

2. That the situation presents the "extreme case" of discrimination so systemic that action taken by the governmental unit to redress particular acts of discrimination would not suffice to prevent further discrimination against members of the victim group;

3. That there is "strong evidence" of a pattern of such racial discrimination; and

4. That the set-aside plan adopted by the governmental entity is narrowly tailored to remedy the specific pattern of discrimination found to exist.

### IV.

### *The Law As To Gender Preferences*

*Croson* dealt with racial and ethnic minorities, but not women. The county ordinance in this case establishes preferences for both minorities and women, so we must look to the governing law applicable to preferences for women-owned business enterprises (WBEs). The Equal Protection Clause applies, but the "strict scrutiny" required by *Croson* for racial preferences has not been used for gender preferences. Rather, the courts apply an "intermediate scrutiny" to determine whether the governmental preference violates Equal Protection. In *United States v. Virginia,* 518 U.S. 515, 532–533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), a case holding that Virginia's exclusion of women from the Virginia Military Institute violated equal protection, the Court described the burden involved in justifying a state-imposed gender preference:

> To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. *See Mississippi Univ. for Women [v. Hogan],* 458 U.S. [718], at 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090. The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Ibid.* (quoting

*Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)).

*Id.* at 532–533, 116 S.Ct. 2264.

The parties in this case do not argue that there could be different results as between the preferences for minorities and the preference for women. Plaintiff argues that there is no justifiable basis for either of the preferences, and defendants contend that both preferences are amply justified by the evidence. Therefore, while recognizing that there are different levels of scrutiny for the two groups, it will not be necessary to make a separate analysis of the evidence applicable to minorities and to women. But at the end of this opinion we will return to the applicable standards and discuss how they relate to our conclusions about the county ordinance.

## V.

### *The Question of Post–Enactment Evidence*

Before trial, plaintiff had moved for summary judgment on the basis that defendants had no evidence of race or gender discrimination that had occurred *before* the enactment of the ordinance. Plaintiff argued that under *Croson* the governmental body must make a finding that such discrimination exists and that the proposed racial and gender preferences are necessary to remedy it. The defendants conceded that they had no specific evidence of pre-enactment discrimination to support the ordinance, but argued that post-enactment evidence would be sufficient if it showed that, in the absence of the ordinance, there would be race and gender discrimination by prime contractors in their selection of subcontractors for work on county projects. To support this theory, defendant intervenors offered a number of affidavits by women and minority group members to the effect that certain prime contractors who had hired them to work on county projects had never hired them on private projects involving the same kind of work. Defendants argued that these affidavits raised a genuine factual issue as to whether, in the absence of the ordinance, there would be race and gender discrimination in the selection of subcontractors for county work.

The post-enactment question was not squarely presented to the Supreme Court in *Croson,* because in that case there had been no specific evidence of discrimination occurring at any time in regard to city construction contracts, either before or after the enactment of the Richmond ordinance. Thus, while the Court emphasized the need for a predicate study justifying the ordinance, it did not have occasion to address the question of whether a showing by circumstantial evidence of what would happen in the absence of the ordinance would be a sufficient predicate. While we had some doubt about the matter, there was no Seventh Circuit case holding post-enactment evidence inadmissible, and several circuits, *see e.g., Engineering Contractors Assoc. v. Metro. Dade County,* 122 F.3d 895, 911–912 (11th Cir.1997) (collecting cases), had held that post-enactment evidence could be sufficient to support a race-based or gender-based preference. We therefore denied plaintiffs' motion and held that the defendants could attempt to make the necessary showing by post-enactment evidence.

## VI.

### *The Relevance of M/WBE's Experience on Private Jobs*

A related problem with defendants' expected proof was that they did not intend to show discrimination on county projects. It was clear that what they intended to show was discrimination against minority-owned and women-owned firms by prime contractors on private construction projects and then argue that these same contractors would also discriminate against them on county jobs if the ordinance was not in place to prevent their doing so.

Post-enactment evidence will usually be related to work not covered by the ordinance, since the ordinance, if effective, should result in the hiring of the required number of women and minorities. In short, the enactment of the ordinance, ideally at least, eliminates the very discrimination the governmental unit needs to show in order to justify the ordinance. If post-enactment evidence is to be used, it obviously must be found outside the construction projects covered by the ordinance. Therefore, we held that defendants would be permitted to show that, while minorities and women were hired and performed successfully on county projects, the prime contractors involved in those county projects refused to hire these same M/WBEs for comparable private work.

## VII.

### *The Burden of Proof*

Normally, of course, the plaintiff in a lawsuit has the burden of proof. But the plaintiff in this case is challenging the constitutionality of a county ordinance which the County has the burden of justifying with "a strong basis in the evidence," *Croson,* 488 U.S. at 500, 510, 109 S.Ct. 706. The Seventh Circuit has explained the respective burdens of the parties in a case where a plaintiff is challenging a governmental action that is subject to this heightened scrutiny:

> Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional.

*Majeske v. City of Chicago,* 218 F.3d 816, 820 (7th Cir.2000) (citations omitted). We understand this to mean that once the governmental entity has made a *prima facie* showing of the necessary interest, the plaintiff has the burden of overcoming the

*prima facie* case by the greater weight of the evidence.

It seemed that the best way to structure the trial would be to have the defendants go first with their evidence, so that the plaintiff would know what evidence it had to overcome and could focus its proof on what was genuinely at issue. The parties were agreeable to this suggestion, and the trial proceeded accordingly.

The following sections of this opinion contain what the court believes is a fair recapitulation of the evidence.

## VIII.

### *The Defendants' Evidence at Trial*
### *Patrick McFadden*

The defendants' first witness was Patrick McFadden, Cook County Purchasing Agent for the past thirteen years. He solicits bids from contractors to supply the needs of the various county departments, including any building construction contracts. He described the solicitation procedure, which includes publication of a description of the project in the Chicago Sun Times legal notice section. In addition, notices are sent to contractors and other persons who have asked to be notified of county construction projects.

When bids are received, they are reviewed for compliance with the plans and specifications for the project and for compliance with the MBE and WBE percentage requirements. The lowest bidder meeting all of these requirements is awarded the job.

Mr. McFadden was not aware of any low bidder who has been denied a contract because of failure to meet the minority and gender requirements.

### *Betty Hancock Perry*

Betty Hancock Perry has been the Cook County Contract Compliance Administrator since 1994 and has been with the Compliance Department since 1990. Ms. Perry and her twelve staff members run the certification program for MBEs and

WBEs and monitor compliance with the set-aside requirements of the ordinance. Her department also has an outreach program to recruit minority and women contractors.

When applicants for certification have been found to qualify, their names are placed in a directory of MBEs and WBEs which is available to the public. There are 900 names in the current directory, 200 of which are in the construction industry.

The Compliance Department also has responsibility for determining that bids are responsive to the set-aside requirements of the ordinance. A bidder can meet the requirements in a number of ways. An M/WBE which bids for the prime contract would obviously meet the requirements, but that is rare because M/WBEs are usually not of a size to handle a prime contract. The typical bidder for a prime contract is a "non-M/WBE," and it meets the requirements by subcontracting portions of the work to M/WBEs, joint-venturing with an M/WBE or by purchasing supplies and equipment from an M/WBE.

The department also handles any requests for waivers of the M/WBE requirements. According to Ms. Perry, waivers can be granted if M/WBEs are not available, or if it is not economically feasible to include them. If a bidder claims that a qualified M/WBE is not available, the department investigates the claim and the Waiver Committee, which meets biweekly, passes on the waiver request.

Ms. Perry is not aware of any waivers that have been granted. She testified that there has been 100 percent compliance with the set-aside requirements.

### Dr. Marcus Alexis

Marcus Alexis, a professor of economics at Northwestern University, was called by the defendants to testify to certain conclusions he had drawn from information furnished by the plaintiff in discovery. The defendants had served interrogatories calling upon the members of plaintiff association to provide information as to the number of private construction contracts on which its members had used M/WBE subcontractors during the years 1990–96. Twenty-two firms responded with some information, and others responded that they had not kept records that would show whether they had used M/WBEs or on which contracts they might have been used.

Analyzing the responses of 13 contractors who provided enough information, Dr. Alexis computed that out of a total of 6,354 contracts reported, M/WBEs had been used on only 436, for a utilization rate of 6.86 percent. Of the 6,354 contracts, Interior Alterations, Inc. was the prime contractor on 5,250 or 82 percent of the contracts awarded. Interior Alterations, Inc. reported using minority subcontractors on 156 of the these contracts, for a utilization rate of 2.97 percent.

Relying upon these interrogatory responses and his previous study of M/WBE set-asides imposed by other governmental units in Cook County, Dr. Alexis concluded that there was an adequate pool of qualified minority- and women-owned businesses available for subcontracting work, but that, in the absence of the ordinance, general contractors would not hire M/WBEs on county work. Where there were no utilization requirements, as is true on most private work, there was very little utilization. Where there is a requirement, there is utilization.

Dr. Alexis opined that his findings were "consistent" with a pattern of discrimination, but he did not contend that they proved discrimination.

On cross examination, Dr. Alexis stated that his review of the discovery materials was not a statistical study and that the question of statistical significance was one he had not considered.

The intervenor defendants called a number of witnesses who testified as representatives of associations of minority- and women-owned construction businesses.

These witnesses gave essentially similar testimony.

### Perry Nakachi

Perry Nakachi testified as President of the Association of Asian Construction Enterprises, one of the intervening defendants. Mr. Nakachi is of Japanese–American ancestry. He is the President of Nak–Man Corp., a distributor of steel and other metal and fabricated parts. This company provides maintenance supplies for industry and government agencies like the County of Cook.

The Association of Asian Construction Enterprises assists its members in the development of business opportunities. The Association has fifty members, one of which is a prime contractor. The ethnicity of its members is Chinese, Japanese, Korean, Filipino and Indian.

The Association receives information on construction projects which it then distributes to its members. It receives about five notices a month from general contractors bidding on government projects with M/WBE requirements, and these notices are filed and available to the membership.

On private projects without M/WBE requirements, on the other hand, these same general contractors send no communications to the Association.

Mr. Nakachi's conclusion (received over plaintiff's objection) is that without the ordinance requiring M/WBE participation, his Association would receive no solicitations for bids on county projects.

### Rafael Hernandez

Rafael Hernandez testified that he is the Executive Director of the Hispanic–American Construction Industry Association, representing Hispanics in the construction industry in the Chicago area. The membership of the organization includes contractors of Mexican, Puerto Rican, Asian, African and Caucasian ancestry. The organization gathers information about construction projects and provides the information to its members. Information is received from public agencies on a regular basis and also from private contractors. Ninety-five percent of the projects about which the organization receives information are public works. Mr. Hernandez has no explanation for this other than the M/WBE requirements applicable to public projects. Information is occasionally received from contractors on private projects, but these are projects that have M/WBE requirements.

### Julie Martines–McKevitt

Julie Martines–McKevitt is the President of Federation of Women Contractors (FWC) another intervening defendant, and she also serves as the President of the Hispanic–American Construction Industry Association ("HACIA"). She is employed by Will Rent, Inc. which rents and sells construction equipment.

FWC has 100 members, consisting of small to larger women-owned firms engaged in the construction business. The organization receives notices about construction projects and passes them on to its members. Ninety-five percent of the notices relate to public jobs with WBE requirements. The majority of the notices come from the public agencies themselves, including the County of Cook.

Ms. McKevitt believes that repeal of the county ordinance would be "disastrous" for FWC's members, an insignificant number of whom do any private work. If the ordinance were repealed, she believes they would go out of business.

### Babbette Peyton

Babbette Peyton is the owner of Peyton Elevator Co. The company designs, builds, installs and maintains elevators and moving sidewalks. She has been in business since 1988.

Ms. Peyton has been president of the Illinois Association of Minority Contractors, one of the intervenors, since 1995. Her testimony about that organization's experience with invitations for bids was the same as that of the other intervening organizations: solicitations are received

from general contractors for projects with M/WBE requirements, but never for private jobs.

In regard to her own company's experience, Ms. Peyton, who is an African–American, testified to a number of incidents with white-owned elevator contractors which she regarded as racially discriminatory. She testified to having had such an incident with four of the six major elevator contractors. It was clear from Ms. Peyton's testimony that she believes the major firms were not giving her the subcontracts she was capable of performing on either public or private work. She does not know whether these companies subcontract to other MBEs.

### Loretta Molter

Loretta Molter is the owner of Molter Corporation, a speciality masonry contractor. When she started her business in 1987 there were no other women masonry contractors, and she remains the only one today. She joined the plaintiff association in 1990 in an effort to market her business. There were no other women members and she was not made to feel welcome. She dropped out after about three years.

Molter Co. is certified as a WBE by many governmental entities, including Cook County. It has done subcontract work for three general contractors on projects with WBE requirements, but these same contractors have not hired the company on private jobs even though Ms. Molter has repeatedly asked them for private work. None of the three general contractors has invited her to bid on a private project.

Sixty to seventy percent of Ms. Molter's work is on projects with WBE requirements. Molter Co. has done no work on Cook County projects and has submitted only one bid on a county project.

### Joseph Williams

A principal witness for the County was Joseph Williams, President of Target Group, a company that provides assistance to major corporations that seek to include M/WBE businesses in their construction projects. His clients include DePaul University, Northwestern University and AT & T. Target has been in business since 1983.

When Mr. Williams is hired by a client he investigates the nature of the project, determines what the owner's M/WBE goals are and what minority- and women-owned firms are available for the project.

The witness described a number of projects in which he was able to place minority- and women-owned firms as subcontractors. These have been both public and private projects. On most of the projects he was able to achieve the percentages desired by the owner. He recalls no instance in which minority or women-owned firms were terminated or were unable to complete the work.

The Target Group is paid a fee by the owner for furnishing names of the minority- and women-owned firms. The fees can be substantial, as illustrated by the Cook County Hospital Project, where the fee was $500,000.

Target's outreach efforts involve examining project plans and contacting minority- and women-owned firms for information as to their ability to do the work.

In summary, the Target Group has generally been able to locate minority- and women-owned firms which meet the M/WBE goals of Target's clients. As far as Mr. Williams can tell, the work of these firms has been satisfactory.

### Colleen Gallagher

Colleen Gallagher is Vice President of Evergreen Supply Company, an electrical supply firm started by her mother in the basement of their home. They have fifteen employees and annual sales of about $10 million. They supply batteries, fuses and all kinds of electrical supplies.

Ms. Gallagher described her experience with a number of contractors who order supplies from her on public jobs but not on private jobs. She believes that if her

prices are right for public jobs they should also be right for private jobs. The materials are the same, whether the job is public or private. Yet, her experience with four different electrical contractors was that they would purchase from her on public jobs but not on private jobs. The owner of Vanmac Electric, a woman named Nancy, told her that Vanmac currently has relationships with other distributors and is not interested in doing more work with Evergreen than is required by the county ordinance.

On cross-examination, Ms. Gallagher stated that there are 100–200 electrical subcontractors which regularly solicit bids from Evergreen. She does not know how many of these firms solicit Evergreen on public but not on private jobs. She has no idea what percentage of her orders in 1999 were for jobs without WBE requirements.

### Karen Johnson

Karen Johnson is President and sole owner of Roughneck Concrete Drilling & Sawing Co., which was started by her father, who was the sole owner until she took it over when he retired in 1994. The company has thirty employees and an annual revenue of $4 million. It supplies, cuts and drills concrete with diamond-tipped saws and drills.

In 1992, when the company was still owned by her father, Roughneck was doing work at O'Hare Airport, core-drilling holes for runway lights. It was working as a subcontractor for Devane Bros. Electric. She visited the job site in her capacity as Operations Manager and encountered Don Enright, Devane's Superintendent. He asked her what she was doing there, which she took as an implication that she had no role there.

Ms. Johnson ran into Enright at various functions of plaintiff association, and he was always cold toward her. At the time of the 1992 incident at O'Hare, Devane was one of Roughneck's top five customers. The following year, Devane ordered very little from Roughneck. She went to see Enright at his office to find out what the problem was. He said "I've never worked with a woman as long as I've been in this business and I'm not going to start now." On June 26, 1998, Enright retired. After that, Devane started doing a lot of business with Roughneck again.

Kenny Co. is another firm that did a lot of business with Roughneck while Ms. Johnson's father was the owner but has done very little since her father retired.

On cross-examination, Ms. Johnson stated that there are subcontractors and general contractors that regularly solicit Roughneck to do work on projects without WBE requirements as well as projects with WBE requirements. Roughneck was worked on only one Cook County project, a job valued at less than $25,000 at the Cook County Hospital. The company worked on 2,000–2,500 projects last year.

### Arthur Arriaga

Arthur Arriaga owns A & C Electric Inc., a company specializing in industrial and commercial electric systems. The company generally acts as a subcontractor. Mr. Arriaga is of Hispanic descent and is presently an officer of HACIA.

Mr. Arriaga considers that his company does good to excellent work. It is used by many electrical contractors on projects with M/WBE goals. He solicits contractors for non-MBE jobs but has obtained no work by such solicitations. One of the contractors that uses him on MBE work but not on non-MBE work is the Paul H. Schwendener Co. Nevertheless, in 1995, 1996 and 1999, the Schwendener Co. did ask him to come in on non-MBE jobs to fix or finish unsatisfactory or incomplete work that had been done by other subcontractors. He did this on a time and material basis, which is not profitable. In the last three years, 98 percent of Mr. Arriaga's revenue has come from MBE projects. Total sales in 1999 were $1.7 million. He believes that if there were no Cook County ordinance his revenue would be reduced

considerably because he would not be hired for county work.

On cross-examination Mr. Arriaga testified that he has worked on only two Cook County projects. In 1997, the witness had said that the Schwendener Co. was fair to minority contractors. He believes that was true then, but it is not true today.

### Susan Hurley

Susan Hurley is President and 100 percent owner of Cable Communications, Inc., an electrical and communications subcontractor. She formed the company in 1987. Ms. Hurley named seven different general contractors which have solicited her for bids on public jobs with WBE requirements but never on private work without such requirements. In 1999, her work was 70 percent public and 30 percent private. The private work was performed directly for companies such as AT & T, Blue Cross, Sears and Ameritech, not for general contractors.

Ms. Hurley stated that on the large public jobs bidding takes place in a sequence, with structural work being bid out and even started first before the inside work, such as electrical, is reached. She has attended bid meetings when the building has been already under construction. Her experience is that contractors will hire WBE subcontractors only up to the minimum requirements, so that by the time they arrive at the electrical work they have already met the requirements and will not consider a small WBE. Instead, they will use a big electrical contractor. This is why Ms. Hurley's company is not hired for the larger WBE projects. A typical project size for her is $50,000.

### Rebecca Munoz–Loss

Rebecca Munoz–Loss, started her own carpentry contracting firm, C.L. Beck Co., in 1996. She owned 70 percent of the company and her husband, Charles Loss, owned 30 percent. He had worked for ten years as a carpenter for the Chicago Public Schools. Ms. Munoz–Loss had been working for an office supply company.

C.L. Beck is certified as both an MBE and a WBE by the Chicago Public School system. In 1999, 98 percent of the company's jobs were subcontracts for carpentry work on Chicago Public School projects.

Ms. Munoz–Loss looks for private work and passes out cards and introductory letters at job fairs. But she is only solicited to make bids on public work.

The company has never been certified by the County of Cook as an MBE or WBE. It has worked on only one Cook County job, a clinic at Cook County Hospital.

### Robert A. Salvitore

Robert A. Salvitore is General Manager of Alvarez Corp., a Hispanic-owned building and landscaping contractor. Alvarez is certified as an MBE with various government agencies, but not with the County of Cook. Its 1999 revenues were $1 million.

Mr. Salvitore testified that the contractors which use Alvarez as a subcontractor on public work with MBE goals rarely contact it for private work. He solicits private work at business fairs, job sites and elsewhere, to no avail. He believes that if MBE ordinances were eliminated, Alvarez would receive no public business and would be left with a small number of private jobs. Alvarez does not submit unsolicited bids because Mr. Salvitore believes they would not be considered.

Alvarez is not certified as an MBE by Cook County and has done no work for Cook County that is covered by the set-aside ordinance. (It has worked on county highway contracts, which are not covered by the ordinance.)

### Dominick Delgado

Another intervenor witness was Dominick Delgado, owner of Delgado Steel Erectors, a business engaged in erecting the steel portions of bridges and buildings. Delgado Steel Erectors has been in business since 1985 and does all of its work as a subcontractor. Mr. Delgado is of Hispanic descent and a member of HACIA

and the Mexican American Chamber of Commerce. He has been solicited by various contractors to submit bids on public jobs but not on private jobs. He has talked to some contractors about obtaining work on private jobs, but he has not received any explanation as to why his company is not offered any public work.

Mr. Delgado's company does not do steel fabrication. He acknowledges that it is easier for a contractor to subcontract with one company which will have responsibility for both fabrication and erection. Only one bid is necessary in that case. Mr. Delgado submits bids for fabrication and erection and then subcontracts the fabrication.

Delgado Steel Erectors is not certified as an MBE by the County of Cook. Mr. Delgado has submitted only one bid on county work since 1998. He did not receive the job and does not know whether he was the low bidder.

### Marilu Meyer

Marilu Meyer started her own construction company, Castle Construction, in 1980. She operated the company until 1995, when she sold her interest. Her gross revenue in 1981 was $300,000, and by 1994 it had grown to $12–15 million. Castle was certified as a WBE with every governmental entity that had WBE requirements.

Castle began by doing carpentry and ironwork and then expanded to masonry and concrete and finally became a general contractor. The company did 250 projects between 1980 and 1995 and never received any complaints about its work.

Of the fifteen projects the company did in 1994, all but three had WBE requirements. Ms. Meyer wanted more private work and frequently requested it, sending letters to every general contractor listed in Dodge Construction News (a daily newsletter that lists all construction jobs) telling them she was a certified WBE looking for work. But she was never solicited for private work. Ms. Meyer gave instances of conversations with management personnel at general contractors which indicated that they desired to use her company only on projects with WBE requirements. She would be told by Quilt Construction Company, for example, that "we don't need you on this job," which she assumes meant that Quilt already had enough WBEs. Jim Kenny, at Kenny Construction Company, would say "Marilu, these projects don't have goals." She had similar conversations with Matt and Don Walsh at Walsh Construction Company.

Ms. Meyer saw the general contractors as an "old boys network," a closed group which perceived women and minorities as less than adequate and closed ranks against them.

Ms. Meyer testified about a conversation with Tim Bell, a materials supplier. She asked him for a quote in connection with a subcontracting bid she was submitting on a job at O'Hare Airport. He responded with a blatantly racist and sexist slur, and she did not receive a quote from him.

Ms. Meyer attended meetings of trade associations while she owned Castle, hoping to obtain business. At the informal cocktail hours, she overheard negative comments about women and minorities.

Ms. Meyer has never applied to join the plaintiff association.

### Michael J. Lombard

Defendants called two members of plaintiff association as adverse witnesses. The first was Michael J. Lombard, Vice President of Lombard Co., a general contractor. He has been with this family-owned company for 23 years and is a registered professional engineer.

The average revenue of the company over the last three years has been $3 million. The company does projects costing $2 million up to $30 million. Public projects are usually larger, averaging from $5–10 million. Private projects average from $2–5 million. The company operates in Cook, DuPage and Will counties.

Mr. Lombard stated that at the present time, building construction in Cook County is "beyond full employment." There are severe shortages of labor in all trades, as well as shortages of project managers and superintendents. This is as good a time as the construction industry has even known, and it has been this way for the last three to four years. The big question is whether to bid or not to bid. A contractor has to make sure that it has the personnel to handle the job.

The general contractor is responsible for meshing all of the subcontractors. The general will self-perform some of the trades, but its primary role is time and quality control. Typical pre-tax profit is 2–3 percent of the contract price. It is a "viciously competitive industry," and price cutting is the norm.

Major risks are bidding too low, subcontractor problems, problems with the architects' drawings, and weather. A job could have 30–40 subcontractors, and it is hard to get cooperation. A team approach is necessary and a contractor does not want more subcontractors than necessary.

It is a high-risk, low reward industry. The life expectancy of a contractor is an average of four to five years.

Most construction industry work is bid, and the bidder competes with other contractors. The bid is a guaranteed lump sum, and the contractor must live with the guarantee.

Lombard submits 40–50 bids a year. Its success rate is about one in 10. Bids can be very close to each other, within a few dollars on multi-million dollar projects.

Lombard may be bidding on more than one job at a time, while simultaneously doing work on other jobs.

The contract process begins when the owner engages an architect or engineer to prepare detailed drawings describing the work. These are the "bid documents," and bids are based on them. In announcing the job the owner typically allows two to three weeks for contractors to prepare their bids. Therefore, the general contractor has to get bids from subcontractors and material suppliers in a very short time.

Lombard is constantly seeking work. It has been in business 44 years, but no one ever walks in and hires them. Lombard has to aggressively pursue work in the private sector. In the public sector, everyone will have an opportunity to bid, and a contractor just has to make sure it hears about the project.

Dodge Construction News is a daily publication containing news of all construction projects in the area, the stages they are in, and other relevant information. The Dodge Market Leader provides the same information on the Internet. A competing service is the Metro Chicago Construction Bulletin that is available by subscription. These bulletins are referred to as "CMD" (construction market data) reports.

When Lombard decides to bid on a job, the project is assigned to one of its estimators. The estimator sends out notices to subcontractors, announcing that Lombard is bidding on the job. The estimator uses a database of subcontractors that is kept on file at the company. Most owners divide work into "divisions" by trade, e.g., plumbing, electrical, etc. There are sixteen divisions. Lombard's subcontractor list is set up by division.

Lombard also receives unsolicited bids. It uses them if they are competitive and from capable contractors. There are more than 4,000 names on the bid list. Various factors influence the selection of a subcontractor. Some jobs have liquidated damage provisions of $3,000 to $4,000 per day for delay, and some subcontractors will not bid on contracts with liquidated damages. Lombard sends out notices by fax, and subcontractors are to respond by fax if they are interested. There is about a 25 percent return. Lombard may telephone subcontractors who have not responded and ask whether they are intending to bid.

On a $10 million job, Lombard may send out as many as 500 bid notices. The bid list includes subcontractors Lombard has dealt with previously and subcontractors which have asked to be included on the list. Names can be removed from the list, sometimes at the request of the subcontractor and sometimes simply because the subcontractor has not responded for an extended period.

Lombard places its notices with Dodge and CMD services. These services will quickly show that Lombard has picked up the bid documents from the owner and is preparing to bid. Any subcontractor serious about working in the Chicago area has to subscribe to one of these two services.

Lombard has a "plan room" where it keeps all the bid documents for all the jobs it is bidding. The room is open from 7 a.m. to 5 p.m. for subcontractors who wish to look at the drawings and specifications for any job. A subcontractor has to look at the bid documents in order to put together a bid. Lombard purchases the bid documents from the owners, and it will often duplicate them for subcontractors.

On contracts without M/WBE requirements, Mr. Lombard testified that his company considers only a subcontractor's ability to do the work. It does not consider race, ethnicity or gender in any way. On projects with M/WBE requirements, the company will often solicit more M/WBEs than it normally does, because it has to meet the requirements in order to get the work. M/WBEs will sometimes be hired for this reason even though they might not be as qualified as the company would like. In order to meet the requirements, the company may have to look beyond the lowest bid from the most capable contractor.

To prepare a bid on a $10 million job, Lombard must spend 200–300 hours of staff time. The cost of duplicating documents and other materials could run as high as $20–25,000.

Lombard does not send bid solicitations to contractor associations. The success of the job depends upon Lombard's own efforts to secure subcontractors.

Eighty percent of the bids from subcontractors come in on the very day Lombard has to submit *its* bid to the owner. This is "bid day." The bids from the subcontractors have to be quickly reviewed and a decision made as to which subcontractors to use and what mark-up to use, or whether to self-perform some of the work instead of using subcontractors. Lombard's bid is then telephoned to its bid team which is standing by at the "bid box." The team fills in the amount of the bid on the line that has been left blank on the bid form and the bid is deposited in the bid box, often just minutes before the deadline.

In soliciting bids from subcontractors, there is a "management limit." The company does not want information overload and would like no more than four to six bids for each division. It tries to obtain a representative sample of bids from subcontractors it knows in each division. Mr. Lombard testified that the company will also consider unsolicited bids.

When bidding for Cook County work, Lombard will lower its standards and seek bids from subcontractors it would not ordinarily solicit. Generally, this is a size issue—the work is beyond the scope of what the subcontractor normally undertakes.

Returning to the subject of how Lombard selects which subcontractor to use after all bids are in, Mr. Lombard stated that the company considers price, capability and track record with Lombard or elsewhere. The company looks for the best subcontractor in terms of these three factors.

Having quality subcontractors that can get the work done on time is what makes or breaks the job. If the bidder has no track record, Lombard will be dealing with the unknown. Therefore, if there are no M/WBE requirements, Lombard will avoid

that risk and not hire a subcontractor without a track record.

As to price, if a subcontractor's bid appears to be too low, Lombard will not use it because it reflects adversely upon the subcontractor's experience.

Race, ethnicity or gender does not enter into the selection at all on projects without M/WBE requirements. Lombard simply selects the best proposal in each trade.

Lombard has bid on approximately seventeen Cook County projects and was awarded seven of them. The company expects to bid on county projects in the future.

In order to reduce the administrative cost of complying with the M/WBE requirements, Lombard has entered into joint venture agreements with a minority general contractor, Harrell Corp.

A minority bidder can count its own work as part of the 30 percent minority requirement. Thus, the work done by Harrell Corp., Lombard's joint venturer, applies against the 30 percent requirement for the joint venture as a whole.

The county ordinance has forced Lombard to enter into joint ventures, and to split profits with the joint venturer, in order to meet MBE requirements. Harrell was brought in to eliminate risk and "get bid day sanity." Without the ordinance requirement, Lombard could have kept all of the profit for itself. Lombard does not believe that Harrell's percentage of the actual work is as large as the share of the profit it receives.

### Michael Schwendener

Another member of plaintiff association called as an adverse witness by defendants was Michael Schwendener, President of Paul H. Schwendener, Inc. for the past sixteen years. The company started out as a masonry subcontractor and became a general contractor in 1934. The Schwendener company did not support the bringing of this lawsuit. The company has never done any work for the County of Cook,

but it has done projects for many other governmental entities. It solicits bids from, and has hired, M/WBE subcontractors on both public and private jobs. The company makes extensive efforts to locate qualified M/WBEs to solicit for bids.

The company has been able to meet M/WBE requirements on public contracts because it has established good relationships with a small number of subcontractors who do good, competitive work. Some are M/WBE and some are non-M/WBE. The company has also entered into joint ventures with MBEs and submitted successful bids on public projects having MBE requirements.

Mr. Schwendener indicated that contractors are usually given more time to perform the work on public projects than on private projects.

Private work usually involves a more compressed schedule, and the contractor has to make sure an MBE can do the work in the time allowed.

The Schwendener company has received a "Contractor of the Year" award from the Chicago Urban League and also from Black Contractors United. Another award for "Excellence in Business" was received from the County of Cook.

### Paul King

Paul King is Executive Director of Black Contractors United (BCU). This is a trade organization which provides technical support and advocacy for minority contractors. It was founded in 1974.

Mr. King stays abreast of projects that might be of interest to BCU's 100 members and keeps them informed of what is going on in the construction industry.

BCU conducts job fairs, but Mr. King does not believe they are of much assistance to minority contractors. The non-M/WBE contractor can use the job fair as a basis for obtaining waivers. That is, he can say that he has made a good faith effort to obtain MBEs by going to a job fair. Also, he has seen minority firms

being solicited at job fairs for "pass throughs," a device whereby, in return for 1–2 percent of the subcontract, an MBE would allow its name to be used in connection with work that would actually be performed by a non-MBE.

Mr. King has not seen MBEs obtaining more business as a result of job fairs.

BCU receives notices and drawings from general contractors, but usually only three days before the bid date. It is not possible for an MBE to prepare a bid within three days. The notices received from government agencies are not as late. They are usually received a week before the bid date.

BCU does not receive many solicitations for private work. The ones it does receive have MBE requirements set by the owners.

On cross-examination Mr. King stated that he checks the Dodge Report and CMD and points out opportunities to members as they visit the office. He does not mail the information out to them.

He does not know whether the contractors who send notices late to BCU send them any earlier to non-MBE subcontractors.

Mr. King does not recall talking to any general contractor about soliciting MBEs for jobs without MBE requirements. He does not think that would be an effective use of his time.

On redirect examination, Mr. King stated that he thinks "some contractors" discriminate against minorities. On recross-examination he was asked to name them, and he said that he was unable to say; he would only be able to do so on a specific contract basis.

### IX.

### *The Plaintiff's Evidence at Trial*
**Douglas Kersey**

Plaintiff's first witness was Douglas Kersey, President of R. Rudnick & Co. for the past eleven years. Rudnick is a general contractor that works primarily on projects for local government agencies. The size of the projects ranges from $500,000 to $6 million. Seventy percent of the work is rehab and 30 percent is new construction. The company self-performs the concrete, carpentry and interior demolition. It is white-owned and is a non-MBE. It is a member of plaintiff association.

When acting as a general contractor, the company usually subcontracts the masonry, mechanical and electrical work. Its typical profit is around 3 percent.

The company submits about 200 bids a year and approximately 10 percent are successful. Rudnick relies on a variety of sources to identify projects to bid on, such as newspapers and the Internet. When Rudnick bids on a job, that fact will be noted in various publications and on the Internet.

Rudnick solicits bids from subcontractors, using a bid list that changes with time. The company solicits a limited number of subcontractors from each trade. Race and gender do not affect which subcontractors are solicited on jobs without M/WBE requirements.

Rudnick bids on Cook County work, and the ordinance causes it to solicit subcontractors it would not otherwise solicit because of their size or experience. Rudnick does not send solicitations to M/WBE trade associations because it can do a good enough job of identifying subcontractors on its own.

Mr. Kersey testified that the standard practice in the industry is for subcontractors' bids to be received by the general contractor as late as 10 to 15 minutes before the owner's deadline.

If Rudnick is bidding against an MBE on a county job it is at a disadvantage because the MBE can count its own work toward the MBE requirement. Rudnick, on the other hand, may have to give away work to an MBE subcontractor that it would ordinarily self-perform at a lower

price. Mr. Kersey has found that the ordinance requires him to use a higher-priced MBE subcontractor rather than a lower-priced non-MBE subcontractor 50 percent of the time. This makes Rudnick's bid higher causing it to lose the job.

The ordinance has adversely affected Rudnick's relationships with some of its non-MBE subcontractors. The fact that it does not solicit them on some jobs because of MBE requirements can cause strain. The ordinance requires Rudnick to discriminate against these subcontractors on the basis of race or ethnicity.

Rudnick has formed joint ventures in order to meet M/WBE requirements on projects it could have performed alone. The joint venture reduces the profitability of the job.

Rudnick ordinarily pays its subcontractors only after it gets paid by the owner. It does not advance payroll and supplies for non-MBE subcontractors, but it has had to do so for MBEs. For example, on one job it had to advance an MBE roofing subcontractor's weekly payroll and the cost of supplies.

Rudnick has had problems with the performance of some MBEs.[11] One flooring subcontractor did a defective job and walked off rather than replace the flooring. Rudnick had to replace it at a cost of $20,000. A minority electrical subcontractor's quote was used for a bid Rudnick submitted, and, when Rudnick was awarded the job, the subcontractor refused to perform. Rudnick had to hire a different subcontractor to do the work at an additional cost of $168,000. In the case of a Hispanic drywall subcontractor, Rudnick had to advance him money during the job and then had to complete the job for an additional cost of $40,000. An Hispanic masonry subcontractor failed to complete a job, which cost Rudnick an extra $12,000 to complete. Also, the subcontractor did

not pay the scaffolding supplier, and the supplier is now suing Rudnick for $13,000.

Rudnick has never requested a waiver on any job with M/WBE requirements. It is a difficult process, and the odds of getting a waiver are not good. Rudnick wants to get the job, and the best way to do that is to meet the requirements.

One reason the waiver process is so difficult is that the bids from subcontractors are received so late in the process. Rudnick will find out at the last minute that it will be unable to meet MBE requirements and at that point it is too late to ask for a waiver.

Mr. Kersey testified that Rudnick has used M/WBEs on many occasions when not required to do so, and gave a number of current examples.

He stated that, on average, M/WBEs are newer and smaller than non-M/WBEs.

In its interrogatory answer, Rudnick had indicated that during the period 1990–96 it had not used any M/WBEs when not required to do so. This was during a period when Rudnick was self-performing all of the small jobs it might otherwise have subcontracted.

Mr. Kersey testified that Rudnick has never discriminated against an M/WBE and would continue to work with them on county jobs even if the ordinance did not exist.

On cross-examination, Mr. Kersey stated that none of the trouble he has had with MBEs took place on Cook County jobs. He has had non-MBE subcontractors which have walked off jobs, failed to pay suppliers and gone bankrupt, just like MBE subcontractors.

Subcontractors' bids are submitted up to the minute before the bid deadline. Fifty percent of the time the MBE he uses has not submitted the low bid.

11. The witness gave the names of the MBE subcontractors, but there is no need to mention the names in this opinion.

As to whether M/WBEs are less qualified than non-M/WBEs, it depends on the size and type of the project. The subcontractor may be competent but not big enough for the particular job. The same can be true of non-M/WBEs.

Rudnick has had considerably more problems with M/WBEs doing unsatisfactory work or walking off the job than it has with non-M/WBEs.

### John Beasley

Another witness for plaintiff was John Beasley, Vice President of Pepper Construction Co., a general contractor founded in 1927. The company has 300 permanent employees and 700 more union employees in the field.

Pepper does construction of all kinds, but strictly in the private sector. It does no public work. Its projects range from $1,000 to $130 million. Its net profit margin is 1–2 percent of the contract price.

Pepper self-performs masonry, drywall and carpentry, which is about 40–60 percent of the total on the average project.

The company solicits proposals from subcontractors, using its database. Subcontractors get on the list by asking. Race, ethnicity or gender is not a factor.

Pepper is a not a minority- or woman-owned enterprise. It is a member of the plaintiff association. It has not bid on any Cook County construction projects.

Pepper does use M/WBEs on projects that do not require them and does not discriminate against M/WBEs.

On cross-examination, Mr. Beasley stated that the use of minority subcontractors on various private jobs did not increase Pepper's costs on those jobs.

### George Farrell

George Farrell is President of Henry Brothers Co., a general contractor founded in 1922. The company does both public and private work but does not bid on work with M/WBE requirements. Because of the Cook County ordinance, Henry Brothers declines to bid on county projects.

Mr. Farrell testified that his company has used M/WBE subcontractors on private and public jobs without M/WBE requirements. In its interrogatory answer, Henry Brothers said that it used M/WBEs on only three of its ninety-three private contracts during the period 1990–96. This answer is incorrect. They were used on all 93 private contracts. He had explained this at his deposition in 1998, when he also stated that he had misunderstood the interrogatory.[12]

Henry Brothers has a plan room with a posted notice of the projects the company intends to bid on. Anyone can come and look at the list and the plans. The company uses unsolicited bids, as well as solicited bids, on just about every project. It never

---

12. Mr. Farrell is one of a number of contractors who testified that their interrogatory answers about usage of M/WBE subcontractors on private job had been mistaken because of a misunderstanding or for some other reason. Defendants objected to this testimony on the ground that the interrogatory answers had never been amended and that plaintiff was therefore bound by the answers as filed. The court overruled the objection because, although defendants are correct that the proper procedure would have been to amend the interrogatory answers, it appears that defendants were advised by plaintiff long before trial that these contractors were now claiming that they had in fact used M/WBE subcontractors to a much greater extent than their interrogatory answers had indicated. Thus, there was no question of surprise. In fact, plaintiff criticized Dr. Alexis for relying on interrogatory answers which defendants knew were "incorrect."

In the absence of surprise, it was the court's view that it should know the actual claimed use of M/WBEs by the answering contractors rather than relying on information that might be contrary to fact. But more importantly, as will appear later in this opinion, the court does not regard the discrepancies between the interrogatory answers and the trial testimony of these contractors to be material to the outcome of the case. Therefore, in the remainder of this opinion we will not include any extended discussion of the subject.

discriminates on the basis of race, sex or ethnicity.

Mr. Farrell has no doubt that he could find qualified M/WBEs that would quote the lowest price on county subcontracts. The reason he does not want to bid county contracts is not that he thinks it would be impossible to find qualified M/WBE low bidders, but, rather, that he is unwilling to give up the freedom to choose whom to hire. Henry Brothers has plenty of work that allows this freedom, so there is no reason to bid on work that would involve restrictions.

### Mark Larsen

Mark Larsen is President and sole owner of Thorleif Larsen & Son, a company that specializes in performing large industrial and commercial masonry subcontracts.

Mr. Larsen testified that the general contractor is the one who decides what parts of the project are going to bear the burden of fulfilling the M/WBE requirements. Masonry is ordinarily a large enough part of a project that the general contractor has to impose requirements on it in order to meet the general's requirements for the project.

The result is that on public projects with M/WBE requirements, Larsen & Son often finds it necessary to subcontract or joint venture masonry work it could self-perform, simply to meet the M/WBE requirements imposed by the general contractor.

Mr. Larsen gave examples of a number of projects that his company could have self-performed but for the quotas. The effect of having to use subcontractors or engage in joint ventures is to reduce the company's profit on the job. It is not easy to divert his unused resources to other jobs. There are not many of the large projects in which his company specializes, so having to share the work with subcontractors or joint venturers results in idle labor, capital and equipment that he cannot find uses for. This has been a problem over the past six years. Without the need to fulfill the M/WBE requirements, his company would have been fully occupied during that time.

Larsen has not done any work for Cook County in recent years. The company has bid on a number of county jobs as part of joint ventures, but the bids were not accepted.

Larsen & Son does not consider race, gender or ethnicity on jobs without quotas.

### Donald Maziurka

Donald Maziurka has been president of George Sollitt Construction Co. for fourteen years and has been with the company for forty-one years. The company has been in business since 1838. It is a general contractor, doing commercial, industrial, institutional and rehab work. The company can self-perform a number of divisions of work. One of the risks in construction projects is the performance of subcontractors. They are the lifeline of the company's work.

Average net profit on a project is around 2 percent. This tight margin is due to competition.

Mr. Maziurka testified that Sollitt has a plan room available to anyone wanting to see copies of plans and specifications for all projects Sollitt intends to bid on.

There is a subcontractor list containing the names of those who have done work in the past and those who have expressed interest. Names are removed if a subcontractor goes out of business or does not do a good job. The company receives unsolicited proposals and occasionally uses them.

The number of solicitations sent out depends on the size of the project. Formerly, the company sent out solicitations to the complete database for the trade involved. Now, however, there are so many names they limit it to those they think might be competitive. The return was small on the larger base.

Sollitt does not send notices to trade associations. It does send notices to Dodge Construction News and the CMD.

Sollitt does work on projects with M/WBE requirements. It usually advances costs for payroll and supplies to M/WBE subcontractors before it is paid itself. It rarely does this with non-M/WBEs.

The company is active in soliciting M/WBE proposals, trying to obtain bids from those it has worked with successfully before. Sollitt also uses M/WBE subcontractors on projects without M/WBE requirements. The witness gave a number of examples. The company does not discriminate on projects not involving requirements and would continue to work with these M/WBEs.

Sollitt sometimes selects M/WBEs with higher prices and lower quality in order to meet requirements.

Sollitt's last project for Cook County was in the late 1980s at the Cook County Hospital.

### Les Kobylar

Les Kobylar is one of the owners of Interior Alterations, Inc. The company was founded in 1976 and employs thirty salaried people and eighty tradesmen. The company is a non-M/WBE, and Mr. Kobylar is white.

The business of the company is tenant improvement contracting, which is construction work on the interiors of office buildings. All of the work is for private clients. It involves making office space ready for a new tenant. Either the landlord, or the tenant, or both, will hire Interior Alterations. The work is tied to leases and occupancy of tenant space. The tenant is moving from one space to another because its lease has ended, and the new space must be made ready quickly. Time constraints are always "aggressive," starting a day or two after the award of the contract and having a completion date that is "severe."

The company uses subcontractors, but must choose them for their known capabilities. It relies on continuing relationships and does not keep lists or records of which subcontractors are M/WBEs. Selection is based on judgment of price and quality, and race or gender is not considered.

The company has never done any work on a construction project for Cook County nor on any other public job.

In selecting subcontractors, the company will start them out on a small, low risk job and build from there as the subcontractor performs successfully and its pricing is predictable.

Interior Alterations currently uses about 20 subcontractors on a project. At least four or five of these are owned by minorities or women.

Using a subcontractor of unknown reliability would create a risk on a project for a long-time client. The company does not wish to jeopardize further business. Some clients have used the company for twenty-three years.

The work on the small jobs goes so fast that the company needs a guarantee that the subcontractor will be there on the day of performance. To have this assurance, the company relies on past experience.

The architects, owners and tenants sometimes influence the choice of subcontractors. The Sears Tower, for instance, has a list of five approved electricians.

Tenants may have previous good experience with particular subcontractors or a business relationship with them. Interior designers or architects will ask Interior Alterations to consider certain subcontractors and not to consider others.

Mr. Kobylar testified that in answering defendants' interrogatories for Interior Alterations he gave estimates as to the numbers of M/WBEs used. The company does not keep records in this manner, and he put down his best guess.

### Professor George R. LaNoue

Professor George R. LaNoue, who directs a variety of social policy programs at the University of Maryland, testified as an expert witness for the plaintiff. Dr. LaNoue prepared an extensive report on the issues in this case, to which he referred

during his testimony. His study of anti-discrimination laws, court decisions, and affirmative action programs has been extensive and of a long duration, and defendants did not question his credentials as an expert in the field.

In 1990, Dr. LaNoue began collecting "disparity studies" commissioned by governmental entities following the *Croson* decision. He has written a number of law review articles on *Croson* and has testified as an expert witness for both plaintiffs and defendants in discrimination cases. He sat through this trial and his testimony was directed toward the testimony he had heard and exhibits he had examined.

Dr. LaNoue gave some relevant statistics based on U.S. Census records and other commonly-accepted data. In 1997, there were 8,778 construction firms in Cook County; 1,072 in Kane County; 2,978 in DuPage County; 977 in McHenry County; 1,794 in Lake County; and 1,629 in Will County, for a total of 17,328 firms in the Six County Region. Most of these firms are small (one to four employees). There are 20 firms in Cook County with more than 250 employees. 1997 figures for M/WBEs have not been published, but the 1992 figures show that, in Cook County, there were 121 firms owned by Blacks, 238 owned by Hispanics, 170 owned by Asians and Native Americans and 1,269 owned by women.

The witness questioned the defendants' attempt to show discrimination in the private construction sector by means of the sparse statistical data contained in the interrogatory answers filed by some of plaintiff's members. To begin with, a disparity study would need to recognize the size of the market. Dr. Alexis had no information about the number of private construction contracts that were let during the period of his study and no information about the number of contractors which were competing for them.

Dr. LaNoue pointed out that Dr. Alexis had used a "simple average" in arriving at his conclusions about the behavior of the 13 contractors furnishing the interrogatory answers. This, in Dr. LaNoue's opinion, was not valid because there was an "obvious outlier," Interior Alterations, Inc., which accounted for 82 percent of all contracts in the sample. Interior Alterations was an outlier in another sense as well, in that its contracts were mostly very small and the use of M/WBE subcontractors may not have been possible.

Dr. LaNoue emphasized the need to determine "availability" under *Croson.* The fact that a firm is in business does not mean that it is capable of doing the particular job or that it is the best, lowest-priced firm ready to do the job.

The witness offered some comments about the success of the Target Group in locating qualified M/WBEs. Assuming that Mr. Williams's description of his success rate is correct, Dr. LaNoue regards the construction projects in question as atypical because the owners engaged Target, at a considerable cost to themselves, to produce M/WBEs. Target's fee can run $500–600,000 for a big project, and, in Dr. LaNoue's opinion, the typical general contractor cannot spend this kind of money when it is successful on only 10–15 percent of its bids. Dr. LaNoue believes that the Target data, therefore, is not a valid basis for estimating the availability of qualified M/WBEs.

In regard to the practice of contractors to solicit bids only from subcontractors with a proven track record, Dr. LaNoue observed that there is no evidence that this adversely affects small, relatively new M/WBEs any more than it does small, relatively new non-M/WBEs.

In regard to the preferences for designated minority groups in the Cook County ordinance, Dr. LaNoue observed that the County had no statistical data as to the availability or utilization of any of the specific groups. It did not even have anecdotal data concerning the experiences of Asian or Native American contractors, or of the different groups defined as Hispanic–American.

The witness testified that subcontractors normally submit quotes to more than one general contractor competing for a project, so that a contractor which ignores a quote from a qualified M/WBE that is the lowest quote runs the risk that the quote will be accepted by one of its competitors for the project. If racial or gender prejudice is the reason the quote is not being considered, it is prejudice that could be costly to the contractor in that it could result in loss of the job.

Dr. LaNoue described the waiver provisions of the ordinance as burdensome and ambiguous. As examples, the ordinance requires a contractor seeking a waiver to have made price and quality comparisons "in good faith," and to have determined that the M/WBE quotes are non-competitive. The criteria for granting the waiver include this and "any other factor determined to be relevant by the CCA" (Contract Compliance Officer). The ordinance further provides that "the determination of the adequacy of a contractor's good faith efforts will be evaluated on the basis of the contractor's actions as of the date of the bid opening."

Dr. LaNoue pointed out that the various steps required by the ordinance in order to show good faith could not be accomplished before the bid date because the contractor often does not receive the subcontractors' quotes until almost the last moment.

On cross-examination, Dr. LaNoue acknowledged the problems in determining availability of subcontractors. If surveys are used, the problem is that the response rates are low, and the more detailed the questions about qualifications, the less likely the subcontractor is to respond. This makes it difficult to obtain a sufficient sample. There is no consensus among consultants on how to determine availability.

Asked how he would go about it, the witness referred to an article he had written where he had said that the availability of a firm can be determined only if it bids. Bidding at least shows that the firm is willing and thinks it has the qualifications.

Counsel for the intervenors inquired as to what inference can be drawn from the testimony of various M/WBE witnesses who said that contractors invited them to bid on public but not private jobs. Dr. LaNoue agreed that there was a pattern to this testimony, but pointed out that the witnesses were a handful of people from the estimated 1,500 M/WBEs that exist in Cook County. He conceded that he could not name any M/WBEs which had successfully made the transition from being solicited only on public work to being solicited on private work as well. But the testimony of these intervenors as to their experience with certain contractors gives no indication as to whether those contractors used other M/WBEs on their private contracts.

### Michael Lombard (Recalled)

Michael Lombard, who had been examined as an adverse witness during defendants' case was recalled as a plaintiff's witness. He gave some further examples of how his company has been burdened by the ordinance. On a county boiler room project, it was necessary to hire an M/WBE excavator which was too small for the job. Lombard had to advance the excavator's payroll and pay its bills. Lombard would not have done this for a non-M/WBE.

On a Cook County Jail project, Lombard had to bypass Pignatos Masonry, the low bid, to hire an MBE mason at a price that was 30–50 percent higher.

On bid day, Lombard seldom has a full complement of low bids from MBEs that would suffice to meet MBE requirements.

Another MBE contractor refused to do the work after Lombard had used its bid. Lombard found a replacement at an added cost of $400,000.

The company has had to subcontract carpentry work it would normally self-perform in order to meet the requirements.

Another burden of the ordinance is the administrative cost of the monthly compliance reports that have to be filed.

Lombard continues to bid county work despite these problems because the company is headquartered in Cook County and has done county work for forty-four years. The company would not be in business without county work.

Lombard Co. has not requested a waiver because of the burdensome procedure and a lack of confidence that a waiver would be granted in any event. Paperwork would have to be filed documenting meetings with assist agencies and the like, and this would have to be done concurrently with the bid process, which often is not complete until the final hours.

The company regularly uses M/WBEs on work without M/WBE requirements. Current jobs include two schools in Calumet City and Plainfield. The witness named a number of M/WBEs that are being used on such current jobs.

Mr. Lombard testified that if the ordinance were eliminated the company would continue to use competitive M/WBEs on county work.

On the joint ventures with Harrell, Inc., the joint venture is the general contractor. It has its own payroll, books and bonding. Thirty percent of the profits go to Harrell and Harrell is at risk for 30 percent of the losses.

On cross-examination, Mr. Lombard testified that the company has a plan room which is used for all of its jobs. A subcontractor has to look at the plans in order to prepare a bid. The Dodge Reports do not contain enough information for a subcontractor to prepare a bid.

When Lombard solicits bids for private work, it sends out a one-page fax informing the subcontractor that it can come look at the plans. Lombard will send plans to some major subcontractors that demand them, but it prefers to avoid the expense.

Mr. Lombard could name only two M/WBE subcontractors he has had to accept when they were not the low bidders.

### Carl R. Hansen

Plaintiff offered portions of the deposition testimony of Carl R. Hansen, who has been an elected member of the Cook County Board of Commissioners since 1974.

Commissioner Hansen was opposed to the ordinance and voted against it. He testified that prior to the passage of the there was no study conducted by the County to determine whether there was any kind of discrimination in county contracts. To the best of his knowledge, there had been no discrimination.

### Admissions

Finally, the plaintiff read into evidence some admissions made by the County in response to Requests to Admit. The County admitted that from 1988 until the present time it has not refused to award a prime contract on the basis of race, gender or ethnicity. Further, it has found no evidence that any county contractor in the six-county area has refused to contract with a subcontractor because of race, gender or ethnicity. The County also admitted that it has not determined the number of MBEs and WBEs that are qualified to perform as prime contractors.

### IX.

#### *Defendants' Rebuttal Case*

#### *James Harrell*

In rebuttal, the defendants called James Harrell, sole owner of an MBE construction firm that does joint ventures with various other construction companies, including Lombard Co.

Mr. Harrell testified that he joint ventures with Lombard so as to have access to larger projects. His bonding authority was only $2 million at the time he started with Lombard. He also wanted an opportunity to learn more. He and Lombard have made money on most of their projects. Lombard Company had wanted him to act as a subcontractor, to fulfill Lombard's minority requirements. He had a problem with that, because he had always been a general contractor, so, after much discussion, they formed a separate joint

venture company. That company is still in operation.

In regard to Mr. Lombard's testimony on adverse examination during defendants' case that Harrell did not do 30 percent of the joint venture work, that testimony was misleading because all of the work was done by the joint venture, which has its own personnel. It is not true that Harrell was essentially getting paid for the use of its name.

## X.

### DISCUSSION

#### What The Proof Shows

The defendants had made it clear prior to trial that they would not attempt to prove there had been discrimination in county contracts prior to the adoption of the ordinance; their evidence of discrimination would be post-enactment. Moreover, defendants did not contend that there had been discrimination in *county* contracts after the ordinance was adopted, since any discrimination that might have been occurring had been eliminated by the ordinance. Thus, defendants had to look beyond the context of county contracts to find evidence that would support the ordinance. It was the court's understanding that they would do this by showing that general contractors treat M/WBEs differently on private contracts, where they are free to discriminate, than they do on county contracts, where the ordinance prevents discrimination. The evidence would show that the same contractors who hired M/WBEs on county projects did not hire them on private projects without M/WBE requirements. While plaintiff contended in pretrial arguments that this would not be a sufficient showing under *Croson*, we resolved doubts in favor of defendants and proceed to trial.

The evidence turned out to be somewhat different than we had anticipated. Defendants made no effort to show discriminatory *hiring* in the private sector. Instead, they attempted to show that M/WBEs were not *solicited for bids* in the private sector. The theory was that because they were not solicited, they could not bid; because they could not bid, they could not be considered, let alone hired, on private projects. Thus, on defendants' theory, proof of failure to solicit is proof of intentional discrimination, especially when considered in light of the fact that these same M/WBEs had rendered satisfactory performance on the county jobs.

The reason defendants' proof is cast in terms of failure to solicit rather than failure to hire is that, with the evidence defendants have, it would be impossible to prove the latter proposition. As defendants acknowledge, a discriminatory refusal to hire would have to be proved on a contract-specific basis. One would have to know which subcontractors were willing and able to do the particular job, which among them was the best qualified, and which had the lowest price. Then one would have to know what subcontractor was hired by the general contractor. If it was a non-M/WBE, and one or more qualified M/WBEs had submitted better bids, an inference of invidious discrimination would be justified unless the contractor could offer a persuasive non-discriminatory reason for choosing the non-M/WBE.

Each construction contract typically involves many subcontracts for the different trades. In order to know whether a general contractor is discriminating on a project, it would be important to know how the contractor is treating M/WBEs not just in one trade, but in each of the trades that is being subcontracted. To get a fair picture of the contractor's behavior on an entire project, therefore, it might be necessary to examine all of the relevant facts in regard to each specific subcontract.

But that would be only the beginning of the analysis. Proof of systemic failure to hire would require more than a look at what one general contractor did on one contract. There are over 17,000 construction contractors in the six-county area. The evidence does not show how many of them act as general contractors, but it is

safe to assume that it runs at least into the hundreds. Neither side presented evidence as to the number of private contracts that are bid each year, but it seems another fair assumption that there are thousands.

It is understandable, therefore, that defendants attempted to find a surrogate for proof of discriminatory failure to hire. Discriminatory failure to solicit, if proved, might qualify. In any event, it is the best defendants can do. Putting aside plaintiff's argument that it is not good enough, we will now consider what evidence there is to support defendants' theory of discriminatory failure to solicit.

The inquiry can be broken down into two questions, and it should be. The first is whether there is proof of a systemic failure to solicit M/WBEs. The second is whether any such failure is because of discrimination based on race, gender or ethnicity.

The proof of a lack of solicitation was provided by the minority and women contractors who testified that they had not been solicited to submit bids on private work although they had persistently requested to be considered for private work. There was also testimony that M/WBE assist organizations never received any information from general contractors about the private projects they were bidding on. Finally, the general contractor witnesses admitted that, for the most part, they made no effort to solicit M/WBEs for bids and did not send project information to M/WBE assist organizations.

We believe this evidence does establish a systemic lack of any effort on the part of non-M/WBE general contractors to solicit bids specifically from M/WBEs for subcontract work. But whether this results in a systemic lack of opportunity to bid is another matter. This is so for several reasons. First, there has been no showing of a systemic exclusion of M/WBEs from databases used by general contractors to solicit subcontractor bids. There has been evidence about the databases of a few general contractors, and that evidence does not show that those contractors never solicit bids from M/WBEs on private work. Even less does it show a consistent failure of all or most general contractors in the six-county area to solicit bids from M/WBEs on private work.

But aside from that, the evidence indicates that general contractors will consider unsolicited bids, whether they be from an M/WBE or a non-M/WBE. Not receiving an invitation to bid is not the same thing as being denied the opportunity to bid. There are thousands of subcontractors which might want to bid on any particular project, and certainly the general contractor cannot be expected to send invitations to all of them. There are various ways, however, that subcontractors can find out about projects and decide whether they are interested in bidding. These include the daily reports published by CMD and Dodge Construction News; Dodge also publishes the information on the Internet. No witness contradicted Mr. Lombard's testimony that any subcontractor serious about doing business in the Chicago area has to subscribe to either the Dodge or the CMD Service. In addition, whether the subcontractor has been invited to bid or not, the plan rooms of general contractors are open to anyone desiring to learn about particular projects and decide whether to bid.

Defendants argue that the lack of an invitation to bid is sufficient evidence that a bid would not be considered. Again, however, this ignores the uncontradicted evidence that unsolicited bids are considered and are sometimes successful.

We conclude, therefore, that defendants have not established a systemic lack of opportunity for M/WBEs to bid on private contracts, the point to which their proof of failure to solicit was directed.

We turn to the second question: assuming there had been a showing of a systemic failure to solicit, and that this resulted in a systemic denial of the opportunity to bid, was the denial because of race, gender or ethnicity?

Some of the intervenors' witnesses testified to comments made by supervisory employees of general contractors that indicated strong prejudice against women and minorities. This testimony establishes that those particular individuals were discriminating on the basis of race and gender in refusing to hire M/WBE subcontractors. This kind of "anecdotal" evidence is commonly used in employment discrimination cases brought against a single employer. It can be sufficient to prove discriminatory motive, since the focus of such a case is often the motive of a single decision maker. In this case, however, the issue involves the motives of a large number of decision makers. Defendants' burden is not to show that one, or even a few employers made biased decisions, but to show that the bias pervaded the industry to the extent that it can fairly be called systemic. While the anecdotal evidence may be sufficient to make a case against the small number of general contractors the witnesses testified about, it stops there.[13] It tells us nothing about bias on the part of any other general contractors and it does not establish a pervasive bias in the industry.

Discriminatory motive can also be proved by statistical evidence. But the numbers must be sufficient to have statistical significance. In this case, the statistics do not meet that test. Dr. Alexis acknowledged that the interrogatory answers he analyzed were not statistically significant and did not tend to prove discrimination.

The question remains whether discriminatory motive can be inferred from the testimony of the intervenor witnesses that they were hired by general contractors on county work, performed satisfactorily, and then were not invited to bid on private work done by these same contractors. Defendants argue that because there was nothing wrong with the work of these subcontractors the explanation must lie in discrimination. If such an inference were justified, it would apply only to the general contractors identified in this testimony and not to a number of contractors sufficient to demonstrate that discrimination characterizes the entire private sector. But we do not have to gauge the breadth of the inference, because it does not arise in the first place. Plaintiff's witnesses have provided legitimate explanations for their election not to solicit bids on private work from these M/WBE subcontractors. The explanations have not been rebutted, and they are clearly not pretextual.

To begin with, there can be a difference between work that is satisfactory and work that is better than that. The fact that an intervenor finished a job and received no complaint about the quality or the price does not establish that the intervenor was the best qualified bidder on that particular county job, let alone that it would be the most qualified subcontractor to do the work on some unspecified private job. The fact that intervenors were hired on the county jobs might be due to the fact that they were the best qualified M/WBEs, not that they were the best qualified bidders, or even the low bidders. Plaintiff's witnesses gave credible testimony that they frequently hired M/WBE subcontractors only to fulfill the M/WBE requirements and not because they believed the M/WBEs were the best qualified firms for the jobs.

There has been virtually no evidence that any general contractor, including the few who were the subject of the intervenors' specific testimony, has hired a non-M/WBE subcontractor on a private project that was less qualified or higher priced than an available M/WBE subcontractor would have been. As we have mentioned

---

**13.** Prejudiced attitudes are sometimes the personal attitudes of the supervisor rather than being reflective of the employer's policy. Recall the testimony of Karen Johnson, owner of Roughneck Concrete Drilling & Sawing Co., who was told by Don Enright at Devane Brothers Company that he would not do business with a woman. Devane Company stopped doing business with Roughneck until Mr. Enright retired, at which time DeVane resumed its relationship with Roughneck and did business as before.

earlier, the record contains virtually no evidence of actual bids made by M/WBEs on private projects.[14] The evidence does not even show whether the general contractors referred to by the intervenor witnesses might have used other M/WBEs to perform the largely unidentified work for which intervenors claim they should have been solicited. (For purposes of this discussion, however, we assume that non-M/WBEs were used.)

The court found persuasive the description given by several witnesses of the fast pace of the construction industry, the aggressive competition, the low margins of profit and the critical need to ensure, as early as possible, that the subcontractors chosen are likely to turn in a problem-free performance. The description of the short time periods allowed by the owners for prime contract bids, the frenetic activity involved in putting the prime bid together, including the receipt of subcontract bids at the last minute on the bid date, would have been hard for the court to believe had the testimony not been entirely uncontradicted. This is the way the industry operates, and it is quite understandable that general contractors prefer, for purely economic reasons, to use subcontractors with which they have had prior good experience instead of taking chances on unknowns.

Minority- and women-owned subcontractors are usually newer and smaller than the non-M/WBEs with the proven track records. With some exceptions, M/WBEs are relatively recent entrants into the construction industry, and the M/WBE requirements on public contracts are largely responsible for their emergence. It is not surprising, therefore, that M/WBEs, as a rule, do not have the proven track records that the general contractors are looking for. But neither do thousands of newer, smaller, *non*-M/WBE subcontractors. In *Croson*, the Supreme Court rejected as justification for the Richmond ordinance a host of nonracial factors which would seem to face a member of any racial group attempting to establish a new business enterprise, such as deficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record. *Croson*, 488 U.S. at 498–499, 109 S.Ct. 706.

Hiring decisions based on these race- and gender-neutral factors are likely to result in the hiring of many more non-M/WBEs than M/WBEs. But as long as the decision is genuinely race- and gender-neutral, the fact that it has a disparate impact on minority- and women-owned firms does not justify the adoption of race and gender preferences by a governmental entity. Such preferences are justified only in "the extreme case" where they "might be necessary to break down patterns of deliberate exclusion." *Croson*, 488 U.S. at 509, 109 S.Ct. 706. *See also, West v. Waymire*, 114 F.3d 646, 650–51 (7th Cir.1997), (disparate impact alone cannot support race- and genderbased remedies)(collecting cases).

Plaintiff makes the point that there is a circularity to defendants' argument that discrimination can be inferred from the fact that M/WBEs are not hired for private work by the contractors which hired them for county work: the ordinance requires the contractor to use M/WBEs for a large percentage of the county contract. Failure to use M/WBEs in the same percentage on private contracts, where it is not required, leads defendants to an inference of discrimination. Therefore, conclude the defendants, the ordinance is justified as a necessary remedy for discrimination.

This is not a case about whether general contractors should adopt voluntary affirmative action plans for their private work. The success of the Target Group in recruiting M/WBEs on behalf of owners

---

**14.** We say "virtually" because there was evidence of one such bid. We have not mentioned the circumstances because they were too isolated to be probative of systemic discrimination.

which desire to grant race and gender preferences, and are willing to pay substantial fees to accomplish that purpose, is not material to the constitutional validity of the Cook County ordinance.

The court concludes that the proof has not shown general construction contractors in the six-county area to have engaged in a pattern of refusing to hire or to consider hiring M/WBE subcontractors because of race, gender or ethnicity.

## XI.

### *Whether the Showing Made Is Sufficient to Support the Ordinance Under Croson*

We will not repeat the discussion of *Croson,* having covered it sufficiently in the introductory portion of this opinion. What the defendants needed to do to sustain the minority quota under the ordinance was "to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race." *Croson,* 488 U.S. at 505, 109 S.Ct. 706. To sustain the quota for women, defendants needed to make an "exceedingly persuasive" showing that the "classification serves 'important governmental objectives' and that the discriminatory means employed are 'substantially related to the achievement of those objectives.'" *United States v. Virginia,* 518 U.S. at 533, 116 S.Ct. 2264 (citations omitted). Defendants have not made either showing. Instead, it is the plaintiff that has presented the persuasive evidence. It has proved that there is no compelling governmental interest that justifies the minority set-asides and no important governmental interest that justifies the set-asides for women. The arduous, unrealistic waiver procedure affords no relief from the rigidity of the set-asides, nor did the drafters of the ordinance intend that it would.

## XI.

### *Narrow Tailoring*

In view of the foregoing conclusions, the question of narrow tailoring might be regarded as moot. However, we will make

clear that even if the necessary governmental interests had been shown, the evidence provides no justification for the minority and female quotas of 30 and 10 percent of the total value of every county contract. The record is bare of any suggestion that the quotas are based on "'a plausible lower-bound estimate of a shortfall in minority representation' that is caused by past discrimination." *Majeske,* 218 F.3d at 823 (citations omitted). Therefore, even if the ordinance had survived the necessary judicial scrutiny in terms of proof of discrimination, it would still be unconstitutional because it is overly broad.

The intervenor defendants have asked, in the event the court finds there was discrimination warranting some remedy, but that the ordinance is overbroad, that the court stay its decision to allow the County to do more tailoring. Plaintiff objected that this would put the court into the business of legislating and would violate the separation of powers. Whatever the merit of that argument, we think that to adopt defendants' suggestion would set a bad precedent. When a governmental entity decides to withhold opportunities from certain persons because of their race, ethnicity or gender, it must act with great care and be as certain as it can be that it has a sound constitutional basis for its action. Governmental bodies should not be encouraged to engage in casual experiments with such programs or to undertake them on a trial and error basis.

Aside from these considerations, there is an illogic in trying to apply the concept of narrow tailoring to this case in the first place. It lies in the circular reasoning noted earlier. Defendants' evidence of discrimination is the differential usage of M/WBEs on public and private contracts. But that differential is compelled by the very ordinance defendants seek to justify by the differential. It is difficult to understand where narrow tailoring would apply. If it means reducing the compulsory percentages, it would to that extent erode defendants' evidence of discrimination.

## CONCLUSION

The court holds that the minority and women preferences required by Cook County Ordinance No. 93–0–38 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The plaintiff association is entitled to an order permanently enjoining enforcement of the ordinance against its members. An appropriate injunction order will be entered.